[No. 12940. *En Banc.* June 6, 1916.]

JESSIE McKINNEY *et al., Respondents,* v. PORT TOWNSEND &
PUGET SOUND RAILWAY COMPANY *et al.,*
*Appellants.*[1]

RAILROADS—NEGLIGENCE—VIOLATION OF STATUTE. Failing to sound the bell or whistle continuously until a crossing is reached, as required by Rem. & Bal. Code, § 2528, is negligence as a matter of law.

SAME—INJURY AT CROSSINGS—SIGNALS — NEGLIGENCE — QUESTION FOR JURY. Whether a bell was rung continuously until a crossing was reached, is a question for the jury where several witnesses testified that they did not hear the bell, although the engineer and fireman and a passenger testified that it was rung.

SAME—INJURY AT CROSSINGS—NEGLIGENCE—EXISTENCE OF OBSTRUCTIONS. Where a building on the right of way at a crossing obstructs the view of the track, the existence of the obstruction is an element to be taken into consideration and imposes a like degree of care on the company and the public.

SAME — INJURY AT CROSSINGS — CONTRIBUTORY NEGLIGENCE — EVIDENCE—SUFFICIENCY. The driver of an automobile is guilty of contributory negligence as a matter of law, in attempting to cross ahead of a train, where he had an unobstructed view of the track for 450 feet, after emerging from behind a building 18 or 20 feet from the track, the train was in view one to three hundred feet away, and he was going at a speed of between ten and fifteen miles an hour up grade on intermediate gear and could have stopped within five feet.

[1]Reported in 158 Pac. 107.

SAME—INJURY AT CROSSING—NEGLIGENCE—LAST CLEAR CHANCE—
EVIDENCE—QUESTION FOR JURY. Whether a train crew was guilty of
negligence in not discovering an automobile stalled on a crossing in
time to have stopped the train is a question for the jury, where it
appears that the crossing was a dangerous one, that the automobile
approached on the side of the fireman, who was not keeping a look-
out and did not see it until the engineer applied the brakes, and
the train stopped within 136 feet and 18 feet after passing the cross-
ing, and the testimony was in conflict.

SAME—INJURY AT CROSSING—LAST CLEAR CHANCE—INSTRUCTIONS.
In an action for wrongful death, when a train struck an automobile
stalled on a crossing, an instruction on the doctrine of last clear
chance is proper where the jury is told that the contributory negli-
gence of the deceased must have culminated in the situation of peril
from which by ordinary care on his part he could not extricate him-
self, and that the train crew, by the use of reasonable care, should
have discovered the stalled automobile in time to have stopped the
train.

FULLERTON and CHADWICK, JJ., dissent.

MORRIS, C. J., and MOUNT, J., dissent in part.

Appeal from a judgment of the superior court for Jefferson
county, Ralston, J., entered January 4, 1915, upon the ver-
dict of a jury rendered in favor of the plaintiffs, in an action
for wrongful death. Reversed.

*Corwin S. Shank, H. C. Belt,* and *Tom W. Holman,* for ap-
pellants.

*A. R. Coleman* and *Allan Trumbull,* for respondents.

ELLIS, J.—Action by the widow and minor children of
James R. McKinney, deceased, for damages for his death as
the result of a collision which took place on the afternoon of
July 3, 1914, between an automobile driven by the deceased
and a train operated by the defendant Port Townsend &
Puget Sound Railway Company, upon a railroad which that
company had leased from the defendant Port Townsend
Southern Railroad Company. The place of the accident was
at Junction Crossing, where the highway from Blynn to Port
Townsend crosses the railroad track. The railway, from a

point between four and five hundred feet south of the crossing to a considerable distance north of the crossing, runs in practically a straight line a little east of north. The highway, at a point about five hundred feet northward from the crossing, approaches the railroad from a westerly direction to within about forty-six feet of the track, where it bends to a southeasterly direction and continues almost parallel with the railroad to within about forty feet of the crossing, when it makes a sharp turn across the railroad track and then extends northward on the other side of the track. Throughout all of this distance, the space between the highway and the railroad track is grown up with trees and bushes. Immediately south and west of the crossing, where the highway turns across the track, stands an old two-story frame building adjacent to the highway and extending up to within eighteen or twenty feet of the railroad track. This building belongs to and is used by the railroad company. The highway is lower than the railroad track, but gradually rising, and at a distance of about eighty feet from the crossing, rises at a grade of twelve and one-half per cent, which is maintained to the track. It appears from the map and a large number of pictures in evidence that, because of the building, trees, and brush on the railroad right of way, there was only a narrow space through which travelers on the highway, and for only a part of the distance between the point where it begins to parallel the railroad and the crossing, could get a view of the railroad track south of the crossing.

On the front seat of the automobile with the deceased, was the wife of his brother, J. E. McKinney, who, with Dayton Beveridge and Louis Jacobson, occupied the rear seat, Jacobson holding upon his lap a small child of J. E. McKinney. All of these had been over the road before, except Mrs. McKinney and Beveridge. A short time before reaching the crossing, both the deceased and his brother remarked that they were approaching the railroad crossing. J. E. McKinney testified:

"We didn't stop the car at any place up along that grade to see if there was a train coming. We didn't do anything more than keep a lookout for the train. The last grade is steeper than any of the rest. I think at the bottom of the pitch my brother threw his gear into intermediate. I spoke to all of them and told them there was a railroad crossing. I think my brother was looking for the train, and we were listening for the train."

Mrs. McKinney testified:

"As we were about half way up that grade approaching the railroad the deceased said 'We are coming to the junction,' and turned back to attend to the car and looked up the road. There was no more said; that was the last he spoke. It seemed to me that the grade was steeper just before we turned to the crossing. I noticed the building close to the track. I should think it would cut off the view from the track; as we approached it it seemed to me it did. I didn't see the railroad track to the south before getting up to within fifteen or twenty feet of it. I didn't hear any whistle or bell as we were coming up the grade."

Beveridge testified that he does not remember personally listening or looking for the train; that the first he knew of danger was J. E. McKinney calling to those in the automobile to jump. None of the occupants of the automobile saw or heard the train until after the automobile came from behind the building, eighteen or twenty feet from the track. The automobile ran forward onto the track, where, for some unaccountable reason, it stopped, stood for a few seconds, and was struck by the engine. Mrs. McKinney, J. E. McKinney, and Beveridge jumped in time to avoid injury. Jacobson was in the act of jumping when the shock of the collision threw him to the road and stunned him. The child remained in the automobile and was uninjured. The deceased received injuries from which he died the same evening. The train consisted of an engine and one passenger car. For a considerable distance beyond the curve to the south of the crossing, there is a slight down grade towards the crossing.

The train was allowed to drift down this grade without the application of steam.

It was charged that the defendants were negligent in failing to remove brush and trees from the right of way south of the crossing so that persons traveling on the highway could see trains approaching from that direction; in maintaining the house on the right of way on the westerly side of the railroad in a position to obscure the track to the south from persons approaching on the highway; in failing to blow the whistle and ring the bell as warning of the approach of the train; in operating the train with an inexperienced and incompetent fireman and engineer; in the failure of the engineer and fireman to see the automobile until the train was within one hundred feet of the crossing, and in failing to stop the train before the collision.

At appropriate times, motions for a nonsuit and for a directed verdict were interposed by the defendants. Both were overruled. The jury returned a verdict in favor of the plaintiffs for $20,000. The defendants' motion for a new trial was denied upon condition that the plaintiffs remit from the verdict the sum of $5,000. The condition being accepted, judgment was entered for the sum of $15,000 and costs. The defendants appeal.

Of the many claims of error, we find it necessary to consider at length but two: (1) Was the deceased guilty of contributory negligence? (2) If he was, did the court err in submitting the case to the jury on the doctrine of last clear chance?

In discussing the question of contributory negligence, we shall assume that the appellants' engineer and fireman were inexperienced and incompetent. A careful consideration of the evidence on that point convinces us that it presented a question for the jury. We shall assume that they were negligent in not sounding the bell or whistle continuously until the crossing was reached, as required by the statute, Rem. & Bal. Code, § 2528 (P. C. 135 § 551). Under a statute

couched in terms almost identical with ours, the supreme court of Montana has held that the failure on the part of a railroad company to observe the prescribed statutory precautions is negligence as a matter of law. *Hunter v. Montana Cent. R. Co.*, 22 Mont. 525, 57 Pac. 140. This court is definitely committed to the doctrine that a failure to observe a positive statutory duty is negligence *per se.* *Engelker v. Seattle Elec. Co.*, 50 Wash. 196, 96 Pac. 1039; *Wilson v. Puget Sound Elec. R. Co.*, 52 Wash. 522, 101 Pac. 50, 132 Am. St. 1044; *Hillebrant v. Manz*, 71 Wash. 250, 128 Pac. 892; *Anderson v. Kinnear*, 80 Wash. 638, 141 Pac. 1151.

Both the fireman and the engineer testified that the whistle was sounded only once and at a distance of twelve hundred feet from the crossing. As to whether or not the bell was sounded as the train approached the crossing, the evidence was conflicting. While the fireman and engineer and one passenger on the train testified that the bell was rung until the emergency brakes were applied about one hundred feet from the crossing, other witnesses who heard the whistle when the train was a quarter of a mile further away, and one of whom actually saw the collision, testified that they did not hear the bell at all. All of the occupants of the automobile said that they did not hear either the bell or the whistle. It is true that the evidence that the bell was not sounded was negative in form, but it was as positive in character as the nature of such a case will usually permit. It was sufficient to take the question to the jury. *Riley v. Northern Pac. R. Co.*, 36 Mont. 545, 93 Pac. 948; *Walters v. Chicago, M. & P. S. R. Co.*, 47 Mont. 501, 133 Pac. 357, 46 L. R. A. (N. S.) 702; *Chicago, B. & Q. R. Co. v. Cauffman*, 38 Ill. 424.

We shall also assume that, owing to the building, trees and brush on the appellants' right of way in close proximity to this crossing, so as to obscure the view of the railroad track from the road north of the crossing, the deceased was not guilty of contributory negligence, as a matter of law, in

failing to discover the approach of the train until he passed up the incline from behind the building to within eighteen or twenty feet of the track.   Whether the deceased was guilty of contributory negligence in failing to discover the approach of the train prior to that time was, under the evidence, a question for the jury.   The court instructed the jury that the existence of this obstruction was an element to be taken into consideration in determining the degree of care to be exercised, and imposed a like degree of care on both the defendants and the public.   The instruction was correct. *Chicago, R. I. & P. R. Co. v. Williams*, 56 Kan. 333, 43 Pac. 246; *Austin v. Long Island R. Co.*, 69 Hun (N. Y.) 67; affirmed in 140 N. Y. 639, 35 N. E. 892; *Indianapolis & St. L. R. Co. v. Smith*, 78 Ill. 112.

·The evidence is conclusive that, when the automobile emerged from behind the building, eighteen or twenty feet from the track, there was an unobstructed view straight down the track for at least four hundred and fifty feet.   It is certain that, at that time, any sort of observation on the part of deceased would at once have advised him of the approach of the train and of the necessity for stopping the automobile before reaching the track.   That he was then aware of the necessity to watch for the train is evident from the fact that, while going up this incline, he remarked to his sister-in-law that they were approaching the crossing.   His brother testified that he saw the locomotive when he was fifteen or twenty feet from the crossing and yelled, "Jump."   The automobile went up the incline at a speed of *between ten and fifteen miles an hour*.   It was running on the intermediate gear.   It was shown by the testimony of two experienced drivers who were familiar with this crossing that an automobile running on an intermediate gear at a rate of fifteen miles an hour could readily be stopped on this grade in a distance of from five to seven feet.   One of these witnesses said that it could be stopped in three feet, and easily in five feet.   *There was no evidence to the contrary.*   The greatest distance that any

witness placed the train from the crossing at the time the automobile came from behind the building was about three hundred feet.  The other witnesses, who were in the automobile, placed the distance at about one hundred and fifty feet.  The fireman and the engineer, who both claimed to have seen the automobile when it came up and stopped on the track, testified that the train was about one hundred feet from the crossing.

If the distance was even the greatest of these estimates, it was clear negligence on the part of the driver to attempt to cross on this up grade in front of the train.  If the distance was one hundred and fifty or one hundred feet, then it was pure recklessness to attempt the crossing.  The deceased was an experienced driver.  It was his duty, as all the witnesses who testified on the subject say, and as common sense dictates, to have had his automobile under control in approaching this crossing, or even in making such a curve as this, had there been no crossing.  While there was no positive or absolute duty to stop before starting up the incline in order to discover whether a train was approaching, there was a positive duty to be on the alert as the automobile proceeded.  The railroad track was in itself a proclamation of danger which imposed a positive duty then to look for the train. *Smith's Adm'r v. Norfolk & W. R. Co.*, 107 Va. 725, 60 S. E. 56; *Aldredge v. Oregon-Washington R. & Nav. Co.*, 79 Wash. 349, 140 Pac. 550; *Woolf v. Washington R. & Nav. Co.*, 37 Wash. 491, 79 Pac. 997; *Bowden v. Walla Walla Valley R. Co.*, 79 Wash. 184, 140 Pac. 549; *Johnson v. Washington Water Power Co.*, 73 Wash. 616, 132 Pac. 392. We must assume that he did so, and if he did, there can be no question that he saw the train immediately on emerging from behind the building, as others in the automobile did. When the train was discovered a short distance away, there was an absolute duty to stop and give it the right of way, if a stop was practicable; and the evidence was conclusive not only that a stop was practicable, but would have been

easy. The deceased took a chance instead of a precaution. We are constrained to hold, on the evidence now before us, that he was guilty of contributory negligence, as a matter of law, in attempting to cross in front of the train. The jury should have been so instructed. To hold otherwise would be to ignore the fact that the train had the right of way on its own track and that it was the duty of the traveler to accord it the right of way.

The appellants assert that there is no room under the evidence for the application of the doctrine of last clear chance, and that in any event the court's instruction on that subject was erroneous. The evidence shows that the automobile became stalled upon the track or, for some unaccountable reason, stopped just as the front wheels crossed the rail, and that it stood there for a period of about ten seconds before being struck by the engine. The brother of the deceased and Jacobson so testified, as did also a boy, Walter Moe, the only one not involved in it who saw the collision. Whether it did in fact stand for that or any appreciable length of time was a question for the jury. There can be no question but that, during whatever time it so stood, the automobile was in plain view of the fireman and engineer had they kept a proper lookout. Both of these testified that the automobile stopped upon the track when the train was about one hundred feet away, but both say it was then too late to stop the train in time to avoid the collision. The engineer testified that the deceased was then working at the levers of the automobile. It is only fair to assume that he was trying to start it. The brother of the deceased said that, when the car came from behind the building, he saw the train at least three hundred feet distant. Others in the automobile said that they first saw the train when it was about one hundred and fifty feet distant. If it was either of these distances, the evidence conclusively shows that, had the emergency brakes then been applied, the train would never have struck the automobile. The sand and marks upon the rails show that the emergency

brakes were applied one hundred and eighteen feet from the crossing, and that the engine stopped eighteen feet after clearing the crossing. It was thus actually stopped in a distance of one hundred and thirty-six feet. From the evidence, it can hardly be doubted that the occupants of the automobile saw the train before either the engineer or the fireman saw the automobile. It is evident, also, that the fireman, whose station was on the left-hand side of the cab, had he been looking, would have seen the automobile at the time that its occupants saw the train. This crossing was known to be a dangerous one. It was the imperative duty, both of the fireman and engineer, to keep a lookout as the train approached it. The fireman admitted that he did not look out at all until he was advised of danger by the engineer applying the brakes. Whether the automobile was actually stalled, or deceased by some mistake threw out the gear and stopped the car on the track and could not start it again in time to save himself, is immaterial on this phase of the case. In either event, the negligence of the deceased had culminated in a condition of danger from which the exercise of due care on his own part could not thereafter extricate him. The sole question therefore is, Could the engineer or fireman, by keeping a proper lookout, have seen the car standing in time to have avoided striking it? On that point, the evidence and the reasonable inferences to be drawn from it were in the sharpest conflict. The question was clearly one for the jury. *Bemiss v. Puget Sound Traction, Light & Power Co.*, 89 Wash. 239, 154 Pac. 171; *Herrick v. Washington Water Power Co.*, 75 Wash. 149, 134 Pac. 934, 48 L. R. A. (N. S.) 640; *O'Brien v. Washington Water Power Co.*, 71 Wash. 688, 129 Pac. 391; *Morris v. Seattle, Renton & Southern R. Co.*, 66 Wash. 691, 120 Pac. 534. The appellants seem to recognize this, since they requested an instruction on the subject. They made no specific request that the question of last clear chance be taken from the jury. The court gave the following instruction:

"The jury are instructed that if you find from the evidence in this case that the deceased, James R. McKinney, was guilty of negligence in driving said automobile onto the railroad crossing, and that said automobile in some way became stalled or hung on said crossing, so that said McKinney *was unable to go across the track, and that while in such dangerous position and unable to extricate himself therefrom,* the engineer and fireman on defendants' train *saw* the automobile stopped on the crossing in time to have stopped the train by the use of reasonable diligence and skill. on their part before reaching said crossing and did not do so, or if you find that said engineer and fireman by the use of reasonable diligence and watchfulness on their part *should have discovered* said stalled automobile on the crossing in time to have stopped the train by the use of reasonable diligence and skill before reaching the crossing and did not do so, then in either event defendants are guilty of such negligence as to render them liable for the killing of said James R. McKinney, if he was killed by defendants' train, regardless of said McKinney's negligence, in going upon said crossing in the first place, the law being that the party who has the last opportunity of avoiding accident is not excused by the negligence of any one else. His negligence, and not that of the one first at fault, is the sole proximate cause of the injury. Stated otherwise, the law is that where both parties are negligent, the one that has the last opportunity to avoid accident, notwithstanding the negligence of the other, is solely responsible for it, his negligence being deemed the direct and proximate cause of it."

Appellants contend that this instruction was erroneous under the rule announced in *Mosso v. Stanton Co.*, 75 Wash. 220, 134 Pac. 941, L. R. A. 1916 A. 943, where we said:

"Assuming that a traveler has negligently placed himself in a dangerous situation upon the highway, then, as we have seen, whenever the person in control of such agency actually sees the traveler's situation and should appreciate his danger,. the last chance rule applies, without regard to the continuing negligence of the traveler concurring with that of the operator up to the very instant of the injury. A second situation to which the rule applies is this: Where the person in control of such agency, by keeping a reasonably careful lookout

commensurate with the dangerous character of the agency and the nature of the locality, could have discovered and appreciated the traveler's perilous situation in time, by the exercise of reasonable care, to avoid injuring him, and injury results from the failure to keep such lookout and to exercise such care, then the last chance rule applies, regardless of the traveler's prior negligence, whenever that negligence has terminated or culminated in a situation of peril from which the exercise of ordinary care on his part would not thereafter extricate him. This last phase of the rule applies whenever injury results from new negligence or from a continuance of the operator's negligence after that of the traveler has so ceased or culminated."

It is urged that the above instruction was erroneous in that it did not tell the jury that, before the second phase of the doctrine of last clear chance as defined in the *Mosso* case could apply, the jury must, from the evidence, find that the negligence of the deceased had culminated in the situation of peril from which the exercise of ordinary care on his own part would not thereafter extricate him. While not expressed in the language suggested in the *Mosso* case, the words which we have italicized in the instruction given do express the same thought. No such thought was expressed in the instruction held erroneous in the *Mosso* case.

Counsel base an argument upon the failure of the instruction which we have quoted to condition the application of the rule upon a finding that the engineer not only *could have seen*, but *should have appreciated* the traveler's perilous situation. In our opinion in the *Mosso* case, that condition was included, and we are satisfied that, in strict accuracy, it should be included in any case. Here, however, if the engineer or fireman had actually seen the automobile at a standstill on the track in time to stop, they could not have failed to appreciate the danger and necessity for stopping the train. Whether they did see the automobile come to a standstill in time to stop, or by the exercise of a reasonably careful lookout could have seen it in time to stop, were plainly, under

the evidence in this case, questions for the jury. Though the case must be tried again, we shall not discuss the various assignments of error addressed to other instructions given. What we have said sufficiently disposes of them.

Of course on a new trial every question of fact will be open for trial on evidence then adduced.

The judgment is reversed, and the cause is remanded for a new trial.

BAUSMAN, HOLCOMB, PARKER, and MAIN, JJ., concur.

FULLERTON, J. (dissenting)—I am unable to concur in the foregoing opinion. The statute makes it a penal offense for an engineer driving a locomotive on any railway to fail to sound the whistle at least eighty rods from any place where the railway crosses a traveled road, or to continue to sound such whistle or ring the bell until such crossing be passed. It is conceded in the record that but one blast of the whistle was blown when the crossing where the accident occurred was approached, and it is a disputed question whether the bell was rung at all. It is a matter of common knowledge that the ordinary signal for a grade crossing is two long and two short blasts of the whistle, and that one blast indicates an approach to a station and a slowing up of the speed of the train, if not a full stop. The evidence, therefore, discloses not only that the operators of the train were negligent in approaching this crossing, but gave signals that were actually misleading. It is in evidence also that the train was three hundred feet away when the automobile reached the railway track, and that both the train and the automobile were traveling at the same rate of speed. This being so, the automobile had time not only to cross the track before the train reached the crossing, but to get nearly three hundred feet away before the train would actually reach it. I can see no reason, therefore, for holding, as a matter of law, that the driver of the automobile was negligent in attempting to cross the track ahead of the train. To my mind,

it was clearly a question for the jury, and that the trial court very properly submitted the question to them. The judgment should be affirmed.

CHADWICK, J., concurs with FULLERTON, J.

MOUNT, J. (dissenting)—It is apparent that the deceased drove his automobile onto the railroad track immediately in front of the oncoming train; at any rate, when it was only ten seconds away. This was the proximate cause of his death, for which he alone was responsible. The action should be dismissed for that reason.

I therefore dissent.

MORRIS, C. J., concurs with MOUNT, J.